IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 13, 2005

## STATE OF TENNESSEE v. TIM FLOOD

**Appeal from the Criminal Court for Knox County**
**No. 69716     Ray L. Jenkins, Judge**

_____

**No. E2005-00878-CCA-R3-CD Filed February 2, 2006**

_____

The defendant, Tim Flood, appeals from his Knox County Criminal Court jury convictions of four counts of rape of a child, for which he received an effective sentence of 40 years in the Department of Correction. On appeal, the defendant claims that the convictions are unsupported by the evidence and that the trial court erred in refusing to allow a proposed defense witness to testify. Because the refusal to permit the defendant to call a witness was error, we reverse the convictions and remand the case.

**Tenn. R. App. P. 3; Judgments of the Criminal Court are Reversed and Remanded.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID G. HAYES, JJ., joined.

R. Dwight Foster and Julie Foster, Knoxville, Tennessee (at trial); and Leslie M. Jeffress, Knoxville, Tennessee (on appeal), for the Appellant, Tim Flood.

Paul G. Summers, Attorney General & Reporter; Leslie Price, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The victim testified that in 1999, when she was eight years old, the defendant, her first cousin, penetrated her mouth with his penis on five occasions. In her testimony, she described the incidents as follows:

> First incident (elected by the state as the basis of count one of the indictment). Near the end of the victim's third grade school term in May 1999, at the home of her aunt, who was also the defendant's mother, the defendant flew the victim's new kite into a tree, and when they went inside the defendant's mother's house, where the defendant

lived, he offered to pay her for the kite if she would "suck" his penis. She agreed, and he paid her four dollars.

Second incident (elected by the state as the basis of count two of the indictment). The victim testified, "I sucked [the defendant's] penis," upon his request, in the den of the defendant's mother's house, near the end of school in May 1999.

Third incident (elected by the state as the basis of count three of the indictment). The victim asked the defendant if she could help him fix his stereo speakers, which were located in his bedroom. He responded that she could help him if she would suck his penis, and she did. She testified that this incident occurred in the same general time period as the preceding incidents.

Fourth incident (which the state did not elect to serve as the basis of a conviction). The defendant offered the victim a popsicle and some money if she would perform fellatio on him, which she did. She testified this event occurred in "like the summer [of 1999], something like that."

Fifth incident (elected by the state as the basis of count four of the indictment). On July 3, 1999, the victim accompanied members of her family to a cookout at the defendant's mother's house. While there, she went inside to use the bathroom, where the defendant had been taking a shower. The defendant instructed her to perform fellatio again, but the victim refused. She testified that the defendant forced her mouth onto his penis and that he moved her head up and down by clasping her hair braids.

The victim testified that, generally, the sexual acts culminated when the defendant's penis emitted "white" or "clear stuff." She testified that, on the night of July 3, 1999, she told her brother about the rapes, and her brother told her mother. Ultimately, the incidents were reported to the authorities.

In addition to the victim's testimony, the state presented evidence that, in an interview with investigators, the defendant became "hostile" and "agitated," although he did not admit to committing any acts of sexual assault. The investigators testified that they were able to confirm through the defendant's mother that she hosted a large gathering for a cookout on July 3, 1999. One of the investigators testified that the defendant's mother told him that, on that date, the defendant slept until noon, left the home about 3:00 p.m., and did not return until that evening.

The defendant offered alibi evidence through five witnesses. His brother, a detention officer with the Knox County Sheriff's Office, testified that he was present during the kite-flying

episode, and when the defendant destroyed the victim's kite by flying it into a high tree, he demanded that the defendant pay the child for the kite. The defendant pulled three dollars out of his pocket and gave the money to the victim. The conversation and exchange of money took place outside the house. The witness did not recall the defendant and the victim going into the house. He testified that his and the defendant's mother was inside the house at the time. The witness also testified that, on July 3, 1999, he and his family arrived at his mother's home between 11:00 a.m. and noon to help her with the cookout preparations. The defendant was not at the home at the time. The defendant arrived a few minutes later and showered. An aunt gave the defendant money, and he left and did not return until after dark. The victim and her family arrived after 3:00 p.m. and left before the defendant returned. The witness had never seen any inappropriate conduct between the defendant and the victim.

The defendant's mother testified that in 1999 she customarily kept a large number of children for family members and would typically have as many as 17 people at her house in the late afternoons. The defendant, her son, lived in the home, and the victim, who was her niece, began regularly visiting at the home in May 1999. The witness testified that her house is very open inside, affording long sight-lines throughout the single-story house, especially in the den, which is viewable from the living room and the patio. On July 3, 1999, the defendant rose in mid-morning. He picked up his girlfriend, who had become ill at work, and brought her back to the witness's house, but within a few minutes, the girl's mother arrived and took her to their own home. The defendant then showered and left the home about 1:30 p.m. The victim arrived with her family about 4:30 or 5:00 p.m., after everyone had eaten and left before dark. The defendant did not return until after dark, when he brought fireworks to the home. A week later, the victim's mother, who is also the witness's sister, called to report the victim's claim of rape. The witness had never seen any inappropriate conduct between the defendant and the victim.

The defendant's sister, a middle-school mathematics teacher, testified that she was in college in 1999 but lived at the Flood residence when she was home. On July 3, she was at home and recalled that the defendant left the house shortly after his girlfriend left with her mother and did not return until 8:00 or 9:00 p.m.. The victim and her family arrived for the cookout between 4:00 and 5:00 p.m. and left by 7:30 p.m. A week later, the witness's mother received a call from the victim's mother about the victim's claims. The witness had never seen any inappropriate conduct between the defendant and the victim.

A family friend testified that he attended the July 3 cookout at the Flood residence. When he arrived at 2:00 p.m., the defendant was not present. The victim arrived at 3:30 or 4:00 p.m. The witness left between 7:00 and 8:00 p.m. and testified that he believed the victim was still there when he left.

The defendant, a Tennessee Department of Transportation (TDOT) employee, testified that he was 20 years old in 1999. He testified that the victim's allegations were totally untrue. He recalled the kite incident, admitting that his brother made him pay two dollars for the victim's kite, but he testified that he and the victim stayed outside the house throughout the episode.

He testified that many children were always around the house and that, in particular, whenever his nephews came to the house, they "stuck to [him] like leeches." He opined that he was never alone with the victim and denied that he had ever worked on his speakers. On July 3, 1999, he picked up his girlfriend from work and took her to the Flood residence. Within a few minutes, her mother arrived and took her to their home. He then showered and went to his girlfriend's house at noon or 1:00 p.m. where he stayed until 5:00 or 6:00 p.m. He and his cousin then began riding around and visiting pawn shops at about 8:30 or 9:00 p.m. After dark, he took some friends home. When he arrived, most of the cookout goers had dispersed, but he and the remaining guests shot fireworks. He testified he never saw the victim on July 3, 1999.

In addition to the defense testimony outlined above, the defendant called to the stand two fellow TDOT employees, each of whom had known the defendant for a number of years and who attested to his good reputation for truth and veracity.

In rebuttal, the state called the victim's mother, who testified that she and her children, including the victim and the victim's brother, arrived at the Flood home at 1:00 p.m. on July 3, 1999. She testified that she brought drinks and assisted in the food preparation. The victim's family left the Flood home at 4:30 or 5:00 p.m. A week later, her son told her about the victim's claims of rape.

The victim's brother testified that he remembered seeing the defendant at the July 3 cookout because he had asked the defendant for a popsicle. He testified that two or three days after the cookout the victim told him about the defendant's sexual assaults. He told his mother the same day.

Based upon the above evidence, the jury convicted the defendant of four counts of rape of a child.

The defendant's first claim on appeal is that the evidence is insufficient to support the convictions and that the trial court erred in denying his mid-trial motion for judgment of acquittal.

When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational fact finder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985); *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000). The standard by which trial courts determine and appellate courts review a motion for judgment of acquittal is essentially the same standard applied when determining the sufficiency of the evidence after a conviction. *See State v.*

*Thompson*, 549 S.W.2d 943, 946 (Tenn. 1977); *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

A person commits rape of a child who unlawfully sexually penetrates, or is penetrated by, a victim, when the victim is less than 13 years of age. Tenn. Code Ann. § 39-13-522(a) (2003).

> If the alleged victim of a sexual penetration or sexual contact within the meaning of § 39-13-501 is less than thirteen (13) years of age, such victim shall, regardless of consent, not be considered to be an accomplice to such sexual penetration or sexual contact, and no corroboration of such alleged victim's testimony shall be required to secure a conviction if corroboration is necessary solely because the alleged victim consented.

Tenn. Code Ann. § 40-17-121 (2003).

In the present case, the defendant's challenge to evidence sufficiency is grounded in his claim that substantial evidence belied the victim's allegations, especially the claim that he sexually penetrated her on the day of the kite mishap and on July 3, 1999. He points to testimony that the victim did not go into the Flood house following the kite mishap and that he paid the money to her while they remained outside. He stresses the testimony of multiple witnesses who stated that the defendant was not present at the Flood home on July 3, 1999, while the victim was present. He points to inconsistency in the state's proof about the time line of the victim's report of abuse to her brother. Also, he relies upon the improbability that a sexual assault could occur in the Flood residence, which is open in the den area and which is usually teeming with youngsters.

We agree that the defendant mounted a strong defense, but the jury heard his defense, as well as the evidence presented by the state. Indeed, there were conflicts in the testimony, but it was singularly the role of the jury to resolve the factual conflicts and to make determinations of credibility, if necessary. Based upon our review of the record, the jury performed its role. On appeal, the defendant's task is not to persuade us that the jury was wrong but rather that it had no reasonable basis for its verdict. In the present case, the testimony of the victim, if believed by the jury, provided that reasonable basis, the defendant's contrary claims notwithstanding. Accordingly,

we hold that the evidence was sufficient to support the convictions and that the trial court did not err in denying the defendant's motion for a judgment of acquittal.

In his next issue, the defendant claims that the trial court erred when it refused to allow him to call the victim's natural father as a witness to impugn the victim's allegations. When the defense opened its case-in-chief, the state objected to the defendant's calling the victim's father to testify. The prosecutor complained that this witness had not been subpoenaed until the day before, that the witness did not wish to testify, and that defense counsel was merely launching a "fishing expedition" because counsel had not spoken with his proposed witness. The trial judge inquired of defense counsel the reason for calling the witness, and counsel responded that the witness would recount statements of the victim that belie her claims of oral penetration by the defendant. The trial court opined that such testimony would be inadmissible and sustained the state's objection. The defendant appropriately asked for a proffer of the proposed witness's testimony, and the trial court received the proffer, out of the jury's presence, following the closing of the state's rebuttal evidence.

In the proffer, the victim's father, who was a Department of Children's Services employee in 1999 and a Tennessee Highway Patrol trooper at the time of trial, testified that the defendant's mother called him, on the day following the victim's mother's call, to inform him of the victim's claims. He immediately went to visit his daughter, whom he found crying in her bedroom in her mother's home. He testified that the victim said that the defendant had "touched" her and had made her "touch" his penis. When the witness asked the victim if she was sure, she replied affirmatively. The victim's father then took her to the hospital. At some point during his accompaniment of the victim, she asked him whether the defendant would still have to go to jail if "someone else" were caught.

In our view, the state's protestations about the service of a subpoena on the victim's father on the eve of his proposed testimony, the proposed witness's reluctance to testify, and defense counsel's failure to interview the proposed witness were not worthy reasons to deny a defendant his bid to call a witness on his behalf. We also doubt that the trial court relied upon these rationales; rather, we perceive that the trial court sustained the objection because it deemed the proposed testimony to be inadmissible hearsay.

The hearsay rule protects the reliability of evidence by requiring the exclusion of a statement made out of court when offered in court to prove the truth of the matter asserted. Tenn. R. Evid. 801. Although an exception to the hearsay rule is provided for admissions of party-opponents, *see* Tenn. R. Evid. 803(1.2), we recognize that victims in criminal cases have not been squarely accorded the status of party-opponents. *See State v. Brown*, 29 S.W.3d 427, 435 (Tenn. 2000) (declining to suggest that a complainant in a criminal case is a party-opponent for purposes of Tennessee Rule of Evidence 803(1.2)). We know of no other hearsay exception that would support admission of the statements as substantive evidence in the present case. Thus, the trial court correctly concluded that the hearsay rule required exclusion of the victim's extrajudicial statements as substantive evidence.

That said, we recognize that the victim's extrajudicial statements *could* have been admissible, not as evidence of the truth of the matter asserted, but as evidence of the victim's credibility as a witness. *See id.* 613(b) (witness's prior inconsistent statement may be used to impeach the witness). The victim's father's accounts of her statements were not admissible for impeachment purposes at the time the defendant proposed the testimony, however, because the defendant failed to pave the way for such impeachment. The defendant did not afford the victim on cross-examination an opportunity to explain or deny the extrajudicial statements. *See id.* (prohibiting extrinsic evidence of a prior inconsistent statement unless "the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require"). Accordingly, we cannot conclude that the trial court's application *of the hearsay rule* to the defendant's bid to present the testimony of the victim's father was erroneous.

That holding, however, does not equate to a ruling that the exclusion of the evidence was otherwise proper.

Our supreme court has lauded as "essential to due process" the right "'to call witnesses in one's own behalf.'" *Brown*, 29 S.W.3d at 431 (citing *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 1048 (1973)); *see Taylor v. Illinois*, 484 U.S. 400, 408, 108 S. Ct. 646, 652 (1988); *Washington v. Texas*, 388 U.S. 14, 23, 87 S. Ct. 1920, 1925 (1967).

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington*, 388 U.S. at 19, 87 S. Ct. at 1923. The denial or "significant diminution" of these rights "calls into question the ultimate integrity of the fact-finding process and requires that the competing interest be closely examined." *Chambers*, 410 U.S. at 295-96, 93 S. Ct. at 1046.

Nevertheless, *Chambers* recognized that the right must yield in appropriate cases "to accommodate other legitimate interests in the criminal trial process." *Id.* at 295, 93 S. Ct. at 1046. Thus, a defendant may be constrained to "comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence" or else suffer the forfeiture of the presentation of testimony, as long as limiting procedural and evidentiary rules are not "applied mechanistically to defeat the ends of justice." *Id.* at 302, 93 S. Ct. at 1049. In other words, such countervailing procedural and evidentiary rules may not be arbitrary or "disproportionate to the purposes they are designed to serve." *Rock v. Arkansas*, 483 U.S. 44, 56, 107 S. Ct. 2704, 2711 (1987).

Thus, in proper cases, the right to present a defense may override the otherwise legitimate exclusion of hearsay evidence. *See Chambers*, 410 U.S. at 302, 93 S. Ct. at 1049; *Green v. Georgia*, 442 U.S. 95, 97, 99 S. Ct. 2150, 2151 (1979). Whether the right to present a defense trumps a procedural or evidentiary rule is determined in each case by whether (1) the excluded evidence is critical to the defense, (2) it bears sufficient indicia of reliability, and (3) a substantially important interest supports exclusion. *See Chambers*, 410 U.S. at 298-301, 93 S. Ct. at 1047-49; *Brown*, 29 S.W.3d at 434-35 (applying the three-point test to determine that hearsay-rule exclusion of testimony of a rape victim's statement to a third party violated the defendant's right to present a defense).

In the present case, we see the proposed evidence as critical to the defense. Because of the nature of the sexual assaults at issue, the state's evidence was devoid of medical or tangible evidence. No confession or incriminating statements of the defendant were presented. The case fundamentally hinged upon the credibility of the victim and of the defendant. In a credibility contest, triers of fact may well scrutinize nuances of tone, inflection, or body language, aspects that we are not privileged to discern from a cold record. Thus, we cannot say it would have been ineffectual for the defendant to show that the victim told her father that the defendant's assaults involved only touching. *See Brown*, 29 S.W.3d at 436 (underscoring the critical nature of a defendant's proposed evidence when credibility is critical to resolving the case). We believe that in the context of the present case, the proposed evidence was critical to the defense.

Next, we determine that the proposed evidence bore sufficient indicia of reliability. The proposed witness was the victim's father, who, in 1999, was himself employed by the Department of Children's Services. Although the victim may have minimized the assaults in speaking to her father, we believe it is unlikely that she would have been untruthful. Also, we believe it is unlikely that her father would have testified falsely under these circumstances.

Turning to the importance of the interest supporting exclusion, the interest at stake is virtually the same as that in *Brown* – a defendant's use of a rape victim's hearsay declarations. In *Brown*, the court observed,

> The admissibility of the evidence Brown seeks to offer in this case is buttressed by its similarity to evidence that is presently admissible, under Tenn[essee] R[ule] of Evid[ence] 803(1.2)(A), as an admission by a party opponent. This rule permits a hearsay declaration which is "the party's own statement in either an individual or a representative capacity" to be entered into evidence. While the State is technically the "party" in a criminal case, the complainant in a criminal case is analogous to a party. Since the hearsay evidence proffered by Brown in this case was the out-of-court statement of the complainant, such testimony is quite similar to hearsay evidence which is currently admissible under Rule 803(1.2)(A). By so stating, we are not suggesting that the proof in this case should have been

admitted as an admission by a party opponent, nor are we holding that the complaining witness in a criminal case is a party for purposes of Rule 803(1.2)(A). The similarity of the evidence sought to be introduced by the defendant to evidence currently admissible pursuant to a firmly rooted hearsay exception is significant. . . .

. . . [G]iven the fact that the evidence sought to be admitted in this case has considerable assurances of reliability and is actually very similar to evidence that is permitted as an exception to the hearsay rule, the State's interest in enforcing the hearsay rule to exclude the evidence is substantially less than Brown's compelling interest in presenting the evidence.

*Brown*, 29 S.W.3d at 435.

As in *Brown*, we conclude that the defendant's "constitutional right to present a defense was violated by exclusion of the proffered hearsay evidence." *See id.* at 436. For this reason, the convictions must be reversed.

_____
JAMES CURWOOD WITT, JR., JUDGE